Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL IX

| EDWIN TORRES FIGUEROA, de por sí y en representación de la Sociedad de Bienes Gananciales habida con su esposa<br><br>Parte Apelada<br><br>v.<br><br>EDNA MORA PIÑERO; CONSEJO TITULARES DEL CONDOMINIO VILLAS DEL FARO<br><br>Parte Apelante | TA2026AP00157 | *APELACIÓN procedente* del Tribunal de Primera Instancia, Sala Superior de Humacao<br><br>Caso Núm.: MB2022CV00033<br><br><br>Sobre:<br><br>Ley de Condominios; Daños y Perjuicios |

Panel integrado por su presidenta, la juez Brignoni Mártir, el juez Salgado Schwarz y la juez Aldebol Mora.

Salgado Schwarz, Carlos G., juez ponente.

## SENTENCIA

En San Juan, Puerto Rico, a 15 de mayo de 2026.

Comparece Edna Mora Piñero (señora Mora Piñero o la apelante) y solicita la revocación de la Sentencia emitida el 13 de enero de 2026 por el Tribunal de Primera Instancia de Humacao (en lo sucesivo foro primario o TPI) en el caso con designación alfanumérica MB2022CV00033.[1] Mediante la referida *Sentencia,* el foro primario declaró con lugar la Demanda en daños y perjuicios presentada por el Sr. Edwin Torres Figueroa (señor Torres Figueroa) y la sociedad legal de gananciales compuesta por este y su esposa, la Sra. Joselyn Manzano Vilá (señora Manzano Vilá) (en conjunto, los apelados), y condenó a la apelante al pago de la suma de $120,234, por concepto de daños, desglosados en

---

[1] *Véase* Entrada Núm. 146 de SUMAC TPI en el caso MB2022CV00033

las siguientes cuantías: (1) $5,000.00 por los daños ocasionados a los apelados; (2)$16,400.00 por los daños al sistema eléctrico del apartamento 708; (3) $16,994.00 por concepto de las reparaciones necesarias para corregir los daños ocasionados; (4)$74,400 por concepto del pago de la hipoteca del apartamento 708;(5) $7,440 por concepto del pago de la cuota de mantenimiento del apartamento 708; (6) $3,000.00 por concepto de angustias mentales y (7) $20,000 por concepto de honorarios por temeridad, además de los intereses legales aplicables.

Por los fundamentos que expondremos a continuación, **modificamos** la Sentencia apelada únicamente a los fines de revocar la determinación del foro primario sobre valorización de daños por uso y disfrute de la propiedad, por falta de prueba.

-I-

El 16 de noviembre de 2022, el señor Torres Figueroa, por sí y en representación de la Sociedad de Bienes Gananciales compuesta por este y su esposa, la señora Manzano Vilá, presentaron *Demanda* en daños y perjuicios en contra de la señora Mora Piñero.[2] Los apelados alegaron en la demanda que, desde el paso del Huracán María, el apartamento #708 de su propiedad, ubicado en el Condominio Villas del Faro Beach Resort (en adelante "Condominio"), sito en el municipio de Maunabo, Puerto Rico, sufrió filtraciones de agua que alegadamente provenían del Apartamento #710 del mismo complejo residencial y propiedad de la apelante. Debido a lo anterior, los apelados solicitaron ser resarcidos por los daños causados al inmueble, además de otras

---

[2] *Véase,* Entrada Núm. 1 de SUMAC TPI.

partidas, entre estas la privación del uso y disfrute de la propiedad.

El 2 de febrero de 2023, la apelante contestó la demanda negando las alegaciones de los apelados y afirmando que realizó gestiones, tanto con los diferentes administradores del Condominio, así como con su compañía aseguradora, con el fin de que se realizaran las evaluaciones correspondientes para determinar las soluciones a los problemas de filtración, tanto en su apartamento como en el del apelado.[3] En su Contestación a la Demanda, la señora Mora Piñero aceptó que los problemas de filtración "también afectaron al apartamento 710", de su propiedad, y afirmó que ella "realizó las correcciones pertinentes". *Id.*

En igual fecha, la señora Mora Piñero presentó *Demanda Contra Terceros* contra el Consejo de Titulares del Condominio (en adelante, el Consejo), en la que alegó que estos eran los responsables de los daños, tanto de la parte apelante como de la parte apelada, porque las filtraciones que afectaban al apartamento 708 provenían del área comunal del edificio.[4] Posteriormente, el 13 de abril de 2023, el Consejo presentó su contestación a *Demanda Contra Terceros*.[5]

El 16 de agosto de 2023, la apelante cursó a los apelados y al Consejo el informe pericial rendido por el Ing. Emilio J. Solís y así lo informó al Tribunal. Dicho informe fue admitido en evidencia durante el juicio y marcado como el *Exhibit* # 30.[6]

---

[3] *Véase*, Entrada Núm. 11 de SUMAC TPI
[4] *Véase*, Entrada Núm 12 de SUMAC TPI.
[5] *Véase*, Entrada Núm. 25 de SUMAC TPI
[6] *Véase* Exhibit #30

El 21 de septiembre de 2023, los apelados presentaron *Moción en Cumplimiento de Orden para Enmendar la Demanda*, y anejaron su *Primera Demanda Enmendada*. En ella, los apelados incluyeron al Consejo como parte demandada y amparados en el informe del Ing. Solís, presentaron alegaciones en contra el Consejo y en contra de la apelante.[7] El apelado alegó en su *Primera Demanda Enmendada* que las filtraciones en su apartamento continuaban y además, alegó expresamente lo siguiente:

> *Según las alegaciones vertidas en este caso, las co-demandadas Edna Mora Piñero y el Consejo se están asignando mutuamente la responsabilidad por las filtraciones. Por lo tanto, ninguna ha asumido la responsabilidad por los arreglos necesarios para detener las filtraciones ni ha compensado al Demandante por los daños y perjuicios sufridos. Sin embargo, uno o ambos de los dos co-demandados es responsable por los arreglos y tienen que compensar los daños sufridos por el Demandante.*[8]

El 2 de noviembre de 2023, tanto el Consejo como la apelante presentaron sus respectivas contestaciones a la *Primera Demanda Enmendada* presentada por los apelados.[9]

Tras varios incidentes procesales, durante el primer día del juicio, los apelados y el Consejo anunciaron haber alcanzado un acuerdo privado de transacción, el cual anejaron de manera confidencial a la *Moción Informativa Sobre Acuerdo de Transacción y Solicitud Conjunta para que se dicte Sentencia Parcial* presentada.[10] A esos fines, el 7 de marzo de 2025, el TPI dictó *Sentencia Parcial* acogiendo los acuerdos alcanzados y desestimó la demanda contra tercero presentada por la apelante en contra del Consejo.[11]

---

[7] Véase, Entrada Núm. 44 de SUMAC TPI.
[8] *Id.*
[9] *Véanse*, Entrada Núm. 49 y 51 de SUMAC TPI.
[10] *Véase*, Entrada Núm. 124 de SUMAC TPI.
[11] *Véase*, Entrada Núm. 127 de SUMAC TPI.

En dicha *Sentencia Parcial* el foro primario dispuso expresamente lo siguiente:

> El Demandante, Edwin Torres y la Demandada, Consejo de Titulares del Condominio Villas del Faro anuncian que han llegado a un Acuerdo de Transacción Confidencial que releva al Consejo de su responsabilidad por las reclamaciones hechas en el caso de epígrafe. Dicho Acuerdo Transaccional Confidencial fue anejado a su moción de manera confidencial, bajo sello.
>
> Por la presente, **el Tribunal acoge los términos del Acuerdo de Transacción Confidencial y, por no existir "razón para posponer que se dicte sentencia sobre tales reclamaciones hasta la resolución total del pleito", Regla 42.1 de Procedimiento Civil, dicta sentencia parcial en conformidad con dicho Acuerdo.** El Tribunal se reserva la jurisdicción y competencia para poner en vigor el Acuerdo mediante ejecución de sentencia, medidas en aseguramiento de sentencia o cualquier otro procedimiento judicial.
>
> De conformidad con los casos de Szendrey v. Hospicare, 158 DPR 648 (2003), Blas v. Hosp Guadalupe, 167 DPR 439 (2006) y Sagardía de Jesús v. Hosp. Aux. Mutuo, 177 DPR 484, 513 (2009), **se ordena además la desestimación de la Demanda Contra Tercero instada por la Sra. Edna Mora Piñero.**[12] (Énfasis suplido)

Así las cosas, el 7 de marzo, 12 y 13 de mayo de 2025, se celebró el juicio en su fondo, el cual prosiguió únicamente en contra de la apelante. La prueba oral desfilada por los apelados consistió en los testimonios del señor Torres Figueroa, de su esposa, la señora Manzano Vilá; del plomero Adrián Espinosa; de la Sra. Sonia Rodríguez, presidenta del Consejo; del contratista David Figueroa; del electricista Ángel Quintana; del arquitecto Enrique López Bigio; y del ingeniero Juan Román.

La prueba oral desfilada por la apelante, parte demandada ante el foro primario, consistió en los testimonios de la señora Mora Piñero y del ingeniero Emilio Solís.

---

[12] *Id.*

La prueba documental admitida en evidencia por el foro primario fue la siguiente:

- *Exhibit 1.* Planos del apartamento #710
- *Exhibit 2.* Carta de la administración dirigida a la Sra. Mora, fechada 10 de enero de 2022
- *Exhibit 3.* Escritura Matriz del Condominio Villas del Faro
- *Exhibit 4.* Reglamento del Condominio Villas del Faro
- *Exhibit 5.* Correo electrónico fechado 3 de enero de 2018, cursado por la Sra. Mora a Alvin Fernández, sobre la evaluación del apartamento 710 realizada en octubre de 2018

Examinadas las alegaciones de la demanda, los documentos sometidos y admitidos en evidencia, y aquilatado el testimonio vertido durante el juicio en su fondo, el foro primario emitió Sentencia en la que declaró Ha Lugar la Demanda presentada por los apelados.[13] En la Sentencia, el foro primario formuló las siguientes determinaciones de hechos probados.

## -I-

### DETERMINACIONES DE HECHOS

1. El demandante, Sr. Torres, está casado con la Sra. Manzano bajo el régimen de sociedad de bienes gananciales y es el titular del apartamento 708 del Condominio Villas del Faro, ubicado en Maunabo, Puerto Rico.

2. La demandada, Sra. Mora, soltera, es titular del apartamento 710 del Condominio Villas del Faro, ubicado en Maunabo, Puerto Rico.

3. Los demandantes adquirieron el apartamento 708 en el año 2001, un mes después del nacimiento de su primera hija.

4. El propósito del matrimonio Torres-Manzano era usar el apartamento 708 como segunda residencia ya que su residencia principal no tiene áreas recreativas para pasar tiempo en familia y, por lo tanto, compensarían con el espacio adicional del Condominio Villas del Faro. Era un lugar de esparcimiento y vida en familia.

5. El apartamento 710 de la Sra. Mora está ubicado justo encima del 708 del apartamento del Sr. Torres, y tienen la misma configuración, con la excepción de que el apartamento 710 tiene un piso adicional de azotea tipo "pent-house", mientras que el apartamento del matrimonio Torres-Manzano tiene un solo piso.

---

[13] *Véase* Entrada Núm. 146 de SUMAC TPI en el caso MB2022CV00033

6. Según los planos del condominio, el apartamento 710 tiene una terraza o azotea en el segundo nivel.

7. La Sra. Mora confirmó que su apartamento 710 está desocupado desde el 2010.

8. En el 2010, el apartamento de la Sra. Mora tuvo una avería de agua en la máquina de hielo.

9. El apartamento 710 se inundó y el agua se filtró al apartamento 708 del Sr. Torres. Ese incidente se resolvió sin mayor contratiempo.

10. Luego de ese incidente, no hubo problemas de filtración hasta que en el 2016 comenzaron filtraciones en el techo del apartamento 708, específicamente en los dos cuartos, la sala, el comedor y los dos balcones ("terrace" y "observation deck"), los cuales componen la mayoría del área del apartamento.

11. Antes del paso del huracán María, los demandantes usaban el apartamento 708 con mucha frecuencia, casi todos los fines de semana.

12. Sus hijos pasaron gran parte de su niñez allí, allí fue donde su hija fue por primera vez a la playa, y la familia invitaba amigos y familiares a pasar tiempo con ellos en la propiedad y las áreas comunes del condominio.

13. Luego del Huracán María, y debido a las filtraciones de agua, los hijos de la pareja Torres-Manzano dejaron de ir a la propiedad debido a las condiciones de este.

14. Para el año 2017, las filtraciones en el apartamento 708 eran visibles y de fácil identificación. El apartamento 708 mostraba manchas y pintura desprendida en los techos y paredes, pisos con manchas de agua, abanicos y otros equipos de metal oxidado.

15. Los demandantes alertaron a la administración y a la Sra. Mora sobre las filtraciones, destaparon los desagües, permitieron el acceso a su apartamento para que se inspeccionara, colocaron cubos, movieron muebles, movieron equipo y cubrieron la mueblería con plástico.

16. Los demandantes no tenían acceso al apartamento de la Sra. Mora.

17. La Sra. Sonia Rodríguez, entonces presidenta de la Junta de directores del Condominio Villas del Faro visitó el apartamento 708 y el 710.

18. La Sra. Rodríguez observó que, en la azotea del apartamento 710, no había lechada en las losas de la terraza, había agua acumulada con tierra amontonada que prohibía que se discurriera el agua, y los desagües estaban tapados, por lo que el agua se empozaba percolaba por la losa sin lechada.

19. El 3 de enero de 2018, la Sra. Mora le cursó un correo electrónico a Alvin Fernández, indicándole que en octubre de 2017 realizó una evaluación de su apartamento, pero no había encontrado contratistas para preparar cotizaciones para preparar un estimado. Expresó, además, que necesitaba discutir con la junta del condominio sobre un problema de drenaje de la terraza de su

apartamento, en el cual se acumula agua que percola a su cuarto principal y a su vez al de su vecino del 708. En dicho comunicado, la Sra. Mora hizo referencia al "problema de drenaje de la terraza de mi apartamento que aparentemente ayuda a que el agua acumulada percole a mi cuarto master y al de mi vecino de abajo 708".

20. En el 2018, la Sra. Mora contrató los servicios del arquitecto Enrique López Bigio, para que evaluara exclusivamente los daños que sufrió su apartamento como consecuencia del paso del Huracán María, con el fin de rendir un informe y así someterlo al seguro del condominio con la valoración de los daños. **El arquitecto López Bigio no inspeccionó el apartamento 708. Su estimado de daños a la propiedad se basó únicamente en observaciones del apartamento 710.**

21. En su **informe de inspección, fechado 13 de febrero de 2018, el arquitecto López Bigio observó que el impacto de los vientos del Huracán María ocasionaron que se descuadrara la puerta de entrada del apartamento 710, rompimiento del empañetado de la pared hacia el balcón, que la puerta del balcón se descuadrara, que las tapas de madera de los huecos de los aires se hayan deteriorado, y la obstrucción de uno de los drenajes de la azotea sobre el cuarto principal, debido a la tierra desplazada en tal área, lo cual ocasionó humedad filtrada desde la azotea.**

22. **El arquitecto López Bigio declaró que de resolverse lo observado en el inciso 7 de su informe, sobre el drenaje tapado en la azotea, se hubiese resuelto el problema de filtración de agua. A saber, en el referido inciso este recomendó liberar la obstrucción de la tubería y colocarles un sellador a las juntas de cerámica en el techo**

23. En diciembre de 2018, a solicitud de la administración del condominio, el plomero Adrián Espinosa inspeccionó el apartamento 710, en presencia de la Sra. Mora y personal de la administración del condominio. No inspeccionó el apartamento 708.

24. El plomero Espinosa fue plomero del condominio por muchos años.

25. Durante su inspección del apartamento 710, el plomero Espinosa observó que estaba en desuso y con pobre mantenimiento, con desagües y parrillas mal selladas, empozamiento de agua en varios lugares y falta de desagües apropiados en la terraza, empozamiento de agua en los parapetos y daños al edificio donde ubican los apartamentos de las partes. El plomero Espinosa rindió una certificación fechada 29 de diciembre de 2018.

26. El 30 de julio de 2021, el Sr. Torres le envió un correo electrónico a la Sra. Mora sobre los daños en su apartamento debido a las filtraciones que provenían del techo. La Sra. Mora respondió mediante correo electrónico enviado el 2 de agosto de 2021, indicándole que su apartamento también se encontraba afectado por "la percolación de la terraza", por lo que se había comunicado en múltiples ocasiones con la administración, sin tener respuesta alguna. No obstante, la Sra. Mora

indicó que se comunicaría nuevamente con la administración y con su seguro para abrir una reclamación.

27. En el 2021, la Sra. Mora contrató los servicios del ingeniero estructural Juan Román Pagán, para que evaluara las condiciones del apartamento a la fecha de la visita, la cual se llevó a cabo el 6 de octubre de 2021. El ingeniero Román únicamente visitó el apartamento 710.

28. En su inspección visual del apartamento 710, el ingeniero Román señaló que observó techos con humedad, hongos y acumulación de agua en los cuartos, la sala de comedor, sala, cocina y lavandería, así como empozamiento de agua en el área del balcón y de la terraza. Indicó que dicho empozamiento pudo haberse filtrado al interior del apartamento 710.

29. El ingeniero Román afirmó que su evaluación no era forense o tenía el propósito de determinar el origen de los daños o proveer soluciones.

30. El 4 de diciembre de 2021, a solicitud de la administración, el plomero José López visitó el apartamento 710 para hacer una inspección, debido a los problemas internos que estaban ocasionando humedad y filtraciones en dicho apartamento. El plomero López emitió una certificación fechada 4 de diciembre de 2021 en la que recomendaba, con relación al apartamento 710, corregir las parrillas de los desagües y anteponer la loza de la terraza, darle tratamiento con membrana y el cambio de la losa. El plomero López no observó filtraciones dimanantes del interior del apartamento 710. Además, le sugirió a la administración que buscaran un experto en filtraciones, toda vez que no era su especialidad. El plomero López no pudo identificar de dónde provenían las filtraciones en el apartamento 710, toda vez que para determinar si había una filtración, hubiese tenido que realizar otros trabajos como, por ejemplo, sacar inodoros y utilizar cámaras, los cuáles no realizó. El plomero López sólo visitó e inspeccionó el apartamento 710.

31. Con relación a la inspección del plomero López, una vez la Sra. Mora recibió la certificación emitida por este, solicitó una reunión a la administración del condominio, la cual no se llevó a cabo.

32. El 10 de enero de 2022, la administración del Condominio Villas del Faro le envió una carta a la Sra. Mora informándole de los resultados de la inspección del plomero Espinosa y explicándole que debe responsabilizarse por el arreglo de acuerdo con la Ley 129-2020 (Ley de Condominios de Puerto Rico), Artículo 39(b)(4).

33. En el 2022, el matrimonio Torres-Manzano presentó un reclamo judicial entre vecinos que fue canalizado a un proceso de mediación en el Tribunal de Humacao. La Sra. Mora no participó.

34. Los problemas mencionados persistieron hasta que alrededor de diciembre de 2022, aproximadamente un mes después de la radicación de la demanda de autos, la Sra. Mora llevó a cabo

ciertos arreglos en su apartamento y las filtraciones hacia el apartamento 708 cesaron.

35. Específicamente, en el 2022, la parte demandada realizó trabajos en su apartamento con el fin de venderlo. Se limpió el apartamento, se raspo, se pintó y se pusieron rejillas nuevas en los desagües de la azotea. No se realizaron trabajos de plomería, sobre el desnivel en la terraza o se quitaron lozas.

36. Los demandantes y el Condominio Villas del Faro desconocen en que consistieron las reparaciones efectuadas por la Sra. Mora en el 2022.

37. El ingeniero Emilio Solís fue contratado como perito de la Sra. Mora por la compañía aseguradora de esta, con el propósito de investigar los problemas de filtración de agua ocurridos en el apartamento 708. Este realizó tres (3) visitas al complejo residencial durante los primeros meses y mediados del año 2023, en las cuales efectuó pruebas, tanto en el apartamento 710 propiedad de la parte demandada, como el 708 propiedad de la parte demandante.

38. El **15 de agosto de 2023**, el **ingeniero Solís** rindió un **informe pericial** donde concluyó que, luego de efectuar las pruebas de agua realizadas en el edificio 7 del condominio Villas del Faro, estas reflejaron que no existen filtraciones en el apartamento 708 que provengan de la azotea o de la tubería de agua potable del apartamento 710. Además, que la filtración de agua en el cuarto máster del apartamento 708, **que estaba ocurriendo en el año 2023**, se debía a alguna apertura en la pared exterior del edificio número 7, elemento que no le pertenece al apartamento 710 y que constituye un elemento común del condominio

39. **Las filtraciones en el apartamento 710 estaban ubicadas en las mismas áreas que las filtraciones que se observaban en el apartamento 708.**

40. **Las filtraciones continuas impidieron el libre uso y disfrute del apartamento 708 en su totalidad durante más de cinco años: desde el 20 de septiembre de 2017, tras el paso del huracán María, hasta alrededor de diciembre de 2022, cuando la Sra. Mora en efecto arregló gran parte del problema de filtración de agua**

41. Durante ese periodo, los demandantes solo iban a su apartamento para limpiar y para pagar la cuota de mantenimiento.

42. Debido a la humedad causada por las filtraciones continuas, el lugar se había convertido nocivo para su salud.

43. **Las filtraciones ocurridas en el apartamento 708 causaron daños a la pintura del techo y las paredes, el mobiliario ubicado en las áreas afectadas, que incluían dos juegos de muebles de cuarto, un juego de sala y uno de comedor, un televisor, un abanico de techo, entre otros equipos electrónicos, y al sistema eléctrico del apartamento.**

44. **El Sr. Torres comisionó cotizaciones de materiales y de servicios de un contratista, David Figueroa, y un electricista, Ángel Quintana.**

45. **El electricista Ángel Quintana testificó que el agua que filtraba al apartamento 708 se adentró en parte del sistema eléctrico y ocasionó daños. En su cotización, suscrita el 8 de diciembre de 2023, el Sr. Quintana estimó los daños eléctricos en $16,400.00.**

46. **El contratista David Figueroa testificó que llevó a cabo una inspección del apartamento 708 en marzo de 2023, y, basado en sus observaciones, efectuó una cotización de una suma total de $16,994.00. La cotización incluyó arreglos de limpieza, pintura, sellado, pulido de piso, remoción de muebles, instalación de abanico y luces, entre otros, en el apartamento 708.**

47. **Durante el periodo relevante, los demandantes continuaron pagando la hipoteca del apartamento 708, la cual consistía en un pago mensual de $1,200.00 y cuotas de mantenimiento, las cuales consistían en un pago mensual de $120.00.**

Conforme a las anteriores determinaciones de hechos probados, el foro primario concluyó que como las inspecciones efectuadas por el ingeniero Solís se llevaron a cabo luego de que la señora Mora Piñero hizo los arreglos en el apartamento 710, tras los cuales cesaron las filtraciones al apartamento 708, no le concedía valor persuasivo alguno a dicho testimonio a los efectos de determinar la existencia u origen de las filtraciones. Sobre estos extremos, razonó el foro primario que, por el contrario, dicha prueba constituía evidencia de que las filtraciones de agua hacia el apartamento 708 cesaron tras los arreglos efectuados por la señora Mora Piñero y que fue debido a tales reparaciones, que para el 2023 ya no existían problemas de filtración. De igual forma, destacó el TPI que el ingeniero Solis reconoció que la filtración de agua que identificó en la habitación principal del apartamento 710 se refería más bien a que salía agua por un receptáculo eléctrico en la pared del referido cuarto cuando él disparaba con una manguera contra la pared exterior del edificio y este admitió que esa maniobra no generaba las filtraciones en el techo ni en las paredes

del cuarto máster que surgían de las fotos del apartamento 708.

De igual forma, concluyó el foro primario en la Sentencia que las fotografías contenidas en el Informe del ingeniero Solís reflejan un apartamento 710 limpio, con pintura nueva, sin marcas de humedad ni de empozamiento, y un drenaje adecuado en la terraza, porque la inspección que él realizó fue efectuada tras los arreglos al apartamento de la apelante. Puntualizó además el TPI, que ello contrastaba con las fotos del apartamento 710 tomadas previo a diciembre de 2022. Finalmente, al aquilatar su valor probatorio, el foro primario concluyó que los experimentos, el informe y el testimonio del ingeniero Solís eran de poca pertinencia en este caso, toda vez que no explicaban las filtraciones continuas que impidieron el libre uso y disfrute de la propiedad y que existían durante el término de la causa de acción y al momento de presentarse la reclamación.

Razonó el TPI que dos de los peritos, el arquitecto López Bigio y el ingeniero Román, así como la presidenta del Consejo, de manera separada, tomaron fotos del apartamento 710 de la señora Mora Piñero, entre el año 2018 y el año 2021 que demostraron la falta de mantenimiento y el abandono de la propiedad. Destacó además, que se admitieron varias fotografías que evidenciaron las filtraciones del apartamento 708, con manchas y pintura desprendida en los techos y las paredes, los pisos con manchas de agua, los abanicos y otros equipos de metal oxidados, los muebles de madera expandidos con el acojinado podrido y material eléctrico oxidado, condiciones que fueron empeorando con el paso del tiempo. De igual forma, el foro primario consideró

que, durante las deposiciones, se le solicitó al señor Torres Figueroa, a la Sra. Rodríguez, presidenta del Consejo del Condominio y a la señora Mora Piñero, que marcaran dónde estaban las filtraciones y que las marcas en los croquis de ambos apartamentos mostraron que las filtraciones en el apartamento 710 estaban ubicadas en las mismas áreas que las filtraciones que se manifestaban en el apartamento 708. Recalcó el foro primario que dichos croquis fueron admitidos en evidencia conjuntamente con sus testimonios.

Como corolario de lo anterior, concluyó el foro primario que los aquí apelados establecieron mediante preponderancia de prueba el nexo causal entre los daños sufridos y las filtraciones de agua provenientes del inmueble perteneciente a la apelante.

Sobre estos extremos, el foro primario concluyó además, que la señora Mora Piñero no presentó evidencia de que las filtraciones ocurridas en el interior de su apartamento provinieran de áreas comunales sobre las cuales no ostenta titularidad y adjudicó que la azotea de su apartamento no es un elemento común o común limitado del condominio.[14] A esos fines, expuso el TPI que la Escritura Matriz del Condominio, la cual fue admitida en evidencia, en su inciso SEXTO(c), dispuso lo siguiente:

> ---SEXTO: Los elementos comunes limitados del Condominio destinados a uno o más Apartamentos, con exclusión de los demás son los siguientes: -----------------
> [...]
> ---(c) **Las terrazas localizadas en las azoteas de los edificios, y las cuales mencionan en las descripciones de aquellos Apartamentos que tienen derecho al uso exclusivo de las mismas**. -------
> ---**Los gastos de mantenimiento de las terrazas asignadas en forma exclusiva a estos Apartamentos,**

---

[14] *Véase* página 13 de la Sentencia apelada.

**serán responsabilidad del titular de dicho Apartamento**.----

Dispuso el foro primario que habiéndose identificado empozamiento de agua debido a los drenajes tapados en la terraza/azotea, la cual era de uso exclusivo de la apelante, le correspondía a esta tomar las medidas necesarias para reparar, limpiar o cualesquiera otras medidas para evitar daños tanto en su propiedad como en las demás unidades. Concluyó el TPI que tanto la Ley de Condominios como el Artículo 1810 del Código Civil de 1930 (vigente a la fecha del surgimiento de la causa de acción), le imponían a la apelante responsabilidad absoluta sobre lo que caía desde su apartamento.

Finalmente, el TPI adjudicó que hay ausencia de controversia alguna sobre la existencia de los daños al apartamento 708, y que ello surge del testimonio de todos los testigos, incluyendo el de la apelante, los cuales establecieron las condiciones del apartamento 708 debido a las filtraciones de agua por tantos años provenientes del apartamento 710.

Inconforme, con la Sentencia, la señora Mora Piñero presentó el recurso de epígrafe y señala la comisión de los siguientes errores por parte del foro primario:

> **PRIMERO: ERRÓ EL TPI AL NO ESTABLECER EN SENTENCIA LA RESPONSABILIDAD ATRIBUIBLE AL CONSEJO DE TITULARES Y NIVELAR LA MISMA CON LA IMPUESTA A LA PARTE AQUÍ APELANTE.**
>
> **SEGUNDO: ERRÓ EL TPI AL DICTAMINAR QUE LA PARTE APELADA ESTABLECIÓ MEDIANTE PREPONDERANCIA DE PRUEBA EL NEXO CAUSAL EXIGIDO POR EL ART. 1810, ENTRE SUS ALEGADOS DAÑOS Y QUE ESTOS FUERON PRODUCTO DE FILTRACIONES PROVENIENTES DEL APARTAMENTO PROPIEDAD DE LA PARTE APELANTE, SIN CONTAR CON PRUEBA O EVIDENCIA DIRECTA QUE SOSTUVIERA ELLO.**

**TERCER: ERRÓ EL TPI AL NO RESOLVER QUE LA PARTE APELADA NO MITIGO SUS DAÑOS, A PESAR DE LA EVIDENCIA DESFILADA EN EL JUICIO AL RESPECTO.**

**CUARTO: ERRÓ EL TPI Y ABUSÓ DE SU DISCRESIÓN EN LA VALORIZACIÓN DE LOS DAÑOS DE LA PARTE APELADA.**

**QUINTO: ERRÓ EL TPI AL DESCARTAR EL INFORME Y PRUEBAS REALIZADAS POR EL ING. EMILIO SOLIS Y NEGARLE SU VALOR PROBATORIO PARA DETERMINAR EL ORIGEN DE LAS FILTRACIONES.**

**SEXTO: ERRÓ EL TPI AL IMPONER TEMERIDAD A LA PARTE APELANTE, A PESAR DE LOS ESFUERZOS DE ESTA, EN LLEGAR A UN ACUERDO TRANSACCIONAL Y LA NEGATIVA DE LA PARTE APELADA AL RESPECTO**

El 24 de marzo de 2026, la señora Mora Piñero presentó la Transcripción del Juicio en su Fondo.[15]

Posteriormente, el 31 de marzo 2026, la apelante presentó ante nos *Alegato Suplementario.*[16] En esencia, sostiene la apelante que la omisión del foro primario de evaluar el efecto de la transacción de los apelados con el Consejo, constituye un error de derecho revisable. Razona la apelante en su *Alegato Suplementario* que toda vez que la Sentencia apelada no integra la cuota de responsabilidad atribuible a elementos comunes, luego de un relevo en la relación interna y externa, este Tribunal de Apelaciones puede y debe corregir la distribución de responsabilidad antes de cuantificar los daños. A esos fines, la apelante arguye que la falta de adjudicación expresa sobre la porción imputable al Consejo amerita revisión plena y la modificación del dictamen del TPI. Razona la apelante que el efecto de la transacción entre los apelados y el Consejo, objeto de la *Sentencia Parcial* emitida por el foro primario, impide que la apelante responda por el porciento de responsabilidad atribuible al Consejo por los elementos comunes. A raíz de ello, esboza la señora Mora Piñero que incidió el TPI al no

---

[15] *Véase* Entrada Núm.7 de SUMAC TA.
[16] *Véase* Entrada Núm.10 SUMAC TA

asignar porción alguna de responsabilidad al Consejo por los daños sufridos por los apelados y al trasladar la responsabilidad completa a la apelante, en contravención a los principios de equidad y nivelación.

De igual forma, sostiene que al concluir que los apelados establecieron, mediante preponderancia de prueba, el nexo causal que exige el Artículo 1810 del Código Civil, el foro primario infirió la causalidad sin que desfilara prueba en el juicio que así lo estableciera.

Sobre la valoración de daños sostiene la apelante que para computar la alegada pérdida de uso y disfrute, el TPI erró al partir exclusivamente del testimonio de los apelados sobre el pago de una hipoteca y cuotas de mantenimiento sin exigir prueba documental que acreditara tales desembolsos. Máxime cuando la propiedad fue adquirida en el 2001 y han transcurrido aproximadamente veinticinco años, lo que razonablemente plantea la duda de si la hipoteca ya estaba saldada al momento de los hechos.

El 30 de abril de 2026, los apelados comparecen ante nos mediante *Alegato de la Parte Apelada.* En síntesis, sostienen que en el caso de epígrafe la totalidad de la prueba desfilada estableció que la señora Mora Piñero rehusó arreglar las filtraciones durante cinco años y que esto causó cuantiosos daños a los apelados e impidió el libre uso y disfrute de su apartamento durante ese tiempo.

Evaluados los escritos de las partes y sus respectivos anejos, así como la Transcripción de la Prueba Oral, estamos en posición de resolver.

**-II-**

**A.**

El Artículo 1810 del Código Civil de 1930, establece que "el cabeza de familia que habita una casa o parte de ella es responsable de los daños causados por las cosas que se arrojaren o cayeren de la misma." 31 LPRA (ante) § 5149.[17]  Sobre estos extremos en *Berio v. Royal*, 164 DPR 797 (2005), el Tribunal Supremo aclaró que al amparo del Artículo 1810, *supra*, el perjudicado no tiene que probar el elemento de negligencia y dispuso expresamente lo siguiente:

> cuando se configura la situación que está recogida en el Art. 1810 —que una cosa caiga o sea arrojada de una vivienda y ocasione daños— la ley nombra un responsable, la "cabeza de familia" o persona que ostente el control de la vivienda, que deberá resarcir los daños independientemente de la diligencia que haya podido desplegar. **Esa ausencia de requisito de negligencia, sin embargo, no releva al perjudicado que demanda—al amparo de esta disposición—de establecer el nexo causal entre la caída del objeto y sus daños y la realidad de los daños sufridos.** En cuanto a esos elementos, al igual que en otras situaciones de responsabilidad civil extracontractual, el demandante carga con el peso de la prueba. *Berio v. Royal*, supra, a la pág. 804.
> (Énfasis  Suplido)

En lo pertinente, en *S.L.G. Vázquez-Ibañez v. De Jesús*, 180 DPR 387, 403-404 (2010), el Tribunal Supremo reiteró que procede invocar el Artículo 1810., *supra*, por los daños ocurridos debido a filtraciones o caídas de líquidos en apartamentos o viviendas por pisos, y aclaró que la responsabilidad impuesta por este artículo "es de carácter objetiva, que incluye dentro de su amplia cobertura las situaciones que involucran filtraciones o caídas de líquidos en complejos de apartamentos". *S.L.G. Vázquez-Ibañez v. De Jesús*, *supra*, a la pág. 404

---

[17] Toda vez que los hechos objeto de la reclamación ocurrieron desde el año 2017, es de aplicación el Código Civil de 1930.

Tal doctrina fue adoptada en el Artículo 1541 del Código Civil de 2020, 31 LPRA § 10806, sobre las obligaciones que nacen de la culpa o negligencia y la responsabilidad objetiva. El referido artículo dispone expresamente que "responden por los daños resultantes, aunque no incurran en culpa o negligencia, salvo cuando la causa del daño resulte de fuerza mayor: … (e) la persona que controla un inmueble o parte de él, por los daños resultantes de los objetos que se arrojan o caen del mismo. Artículo 1541 del Código Civil de 2020, 31 L.P.R.A. § 10806.

**B.**

En lo que concierne al régimen de propiedad horizontal, en *S.L.G. Vázquez-Ibañez v. De Jesús, supra* a la página 404, el Tribunal Supremo concluyó que al amparo de Art. 15(g) de la Ley de Condominios de 2003, cuando las cosas se caen o se arrojan desde un complejo de viviendas sometido al régimen de propiedad horizontal, la responsabilidad no es precisamente de quien tenga la posesión de hecho de la vivienda, sino que el responsable es el dueño del apartamento. En esos términos, aclaró que la responsabilidad impuesta por el Art. 15(g) es objetiva, y se trata de una responsabilidad absoluta de parte del titular del apartamento que no requiere probar culpa o negligencia. *S.L.G. Vázquez-Ibañez v. De Jesús*, *supra*, a la pág. 411-412, Finalmente el Tribunal Supremo enfatizó que la responsabilidad impuesta en el Art. 15(g) de la Ley de Condominios de 2003, *supra*, es solidaria entre el titular del apartamento y cualquier familiar, visitante, empleado o persona que ocupa el apartamento y sea responsable del

daño causado. *S.L.G. Vazquez, Ibanez v. De Jesus, supra*, a la pág. 411.

De otra parte, en cuanto a la responsabilidad de realizar reparaciones en el inmueble, el Artículo 15(d), de la Ley de Condominios de 2003, establecía que cada titular deberá ejecutar a sus únicas expensas las obras de modificación, reparación, limpieza, seguridad y mejoras de su apartamento, sin perturbar el uso y goce legítimo de los demás. 31 LPRA 1291m. Dispuso además, que es deber ineludible de cada titular realizar las obras de reparación y seguridad, tan pronto sean necesarias para que no se afecte la seguridad del inmueble ni su buena apariencia.*Id*. Asimismo, estableció que todo titular u ocupante de un apartamento vendrá obligado a permitir en su apartamento las reparaciones o trabajos de mantenimiento que exija el inmueble, permitiendo la entrada al apartamento para su realización. *Id.* Dicho artículo fue adoptado en el Artículo 39(b) de la Ley de Condominios de 2020, 31 LPRA sec. 1922k.

En lo pertinente a la naturaleza de los bienes en un régimen de propiedad horizontal, el Artículo 21 de la Ley de Condominios de Puerto Rico, Ley 129-2020, dispone que "serán considerados elementos comunes, **pero con carácter limitado, siempre que así lo exprese la escritura matriz** … aquellos que se destinen al servicio de más de un titular con exclusión de los demás, tales como pasillos, escaleras y ascensores especiales, servicios sanitarios comunes a los apartamentos de un mismo piso y otros análogos." 31 L.P.R.A § 1921t. A su vez, el Artículo 3 de la Ley de Condominios de 2020, incluye como elementos comunes aquellos que se destinen

al servicio de más de un titular con exclusión de los demás, tales como pasillos, escaleras y ascensores especiales, servicios sanitarios comunes a los apartamentos de un mismo piso y otros análogos. 31 L.P.R.A § 1921b. [18]

Cónsono con lo anterior, el Artículo 43 de la Ley de Condominios de Puerto Rico, Ley 129 – 2020, dispone que lo relativo a los elementos comunes limitados le corresponde a los titulares de los apartamentos a los que fueron destinados los mismos. 31 L.P.R.A §1922°,

Sobre estos extremos, en *Batista Nobbe v. JTA Directores*, 185 DPR 206,223 (2012) el Tribunal Supremo determinó que "*aunque en la escritura matriz de un condominio se denomine un área como elemento común limitado, si responde al servicio de un solo apartamento realmente es un área privativa.*"

En cuanto a la responsabilidad del titular, el Artículo 39(b)(4) de la Ley 129-2020 dispone expresamente lo siguiente:

> 4). Cada titular deberá ejecutar a sus únicas expensas las obras de modificación, reparación, limpieza, seguridad y mejoras al apartamento, sin perturbar el uso y goce legítimo de los demás. Será deber ineludible de cada titular realizar las obras e reparación y seguridad, tan pronto sean necesarias para que no se afecte la seguridad del inmueble ni su buena apariencia,31 LPRA sec. 1922k

## C.

En reiteradas ocasiones, el Tribunal Supremo ha expresado que la estimación y valoración de daños es una tarea difícil y angustiosa, dado que "no existe un

---

[18] El Artículo 12 de la derogada Ley de Condominios de 2003. 31 L.P.R.A. § 1291j, disponía que "serán considerados elementos comunes, pero con carácter limitado, siempre que así se acuerde expresamente por la totalidad de los titulares del inmueble, aquellos que se destinen al servicio de cierto número de apartamentos con exclusión de los demás, tales como pasillos, escaleras y ascensores especiales, servicios sanitarios comunes a los apartamentos de un mismo piso y otros análogos.

sistema de computación que permita llegar a un resultado exacto en relación con el cual todas las partes queden satisfechas y complacidas". *Santiago Montañez et al. v. Fresenius Medical et al.*, 195 DPR 476, 490 (2016). los tribunales apelativos intervendrán con las estimaciones de daños realizadas por el Tribunal de Primera Instancia cuando la cuantía concedida sea exageradamente alta o ridículamente baja. *Íd.*, págs. 490-491.

El ejercicio de valoración de daños conlleva cierto grado de especulación y elementos subjetivos, tales como la discreción y el sentido de justicia y conciencia humana del juzgador de los hechos. *Íd.*, pág. 491. Además, no existen dos casos idénticos, debido a que cada uno tiene sus circunstancias particulares. Por tanto, al comparar las cuantías concedidas en casos previos, hay que ajustarlas al valor presente. *Íd.* Véase, además, *Meléndez Vega v. El Vocero de PR*, 189 DPR 123, 204-205 (2013).

Finalmente, el Tribunal Supremo advirtió a los jueces del Tribunal de Primera Instancia sobre la importancia de detallar específicamente en los dictámenes los casos similares utilizados como referencia o punto de partida para la estimación y valoración de daños y el cómputo realizado para establecer las cuantías que se concedan. Esto, dado que las compensaciones otorgadas en casos previos constituyen un punto de partida y referencia útil para que los tribunales apelativos puedan pasar juicio sobre las concesiones otorgadas por el foro primario. *Santiago Montañez et al. v. Fresenius Medical et al.*, *supra*, pág. 493.

**D.**

"La Regla 44.1 (d) de Procedimiento Civil, 32 LPRA Ap. V. R. 44.1(d), dispone que en caso de que cualquier parte o su abogado o abogada haya procedido con temeridad o frivolidad, el tribunal deberá imponerle en su sentencia al o a la responsable el pago de una suma por concepto de honorarios de abogado que el tribunal entienda corresponda a tal conducta".

El fin de la imposición de honorarios de abogado es "penalizar o sancionar a aquellas partes que por su temeridad, obstinación, contumacia e insistencia en una actitud frívola o desprovista de fundamento, obligan a otra partea asumir y sufrir las molestias, gastos, trabajo e inconvenientes de un litigio innecesario". *Corpak, Art Printing v. Ramallo Brothers*, 125 DPR 724, 737 (1990) Son actuaciones de una parte que hacen necesario un pleito que se pudo evitar o que provocan la indebida prolongación del mismo. *Colón Santos v. Coop. Seg. Mult. De PR*, 173 DPR 170, (2008). Es la conducta que obliga a acudir al tribunal para reclamar algo que pudo haberse resuelto fuera del foro judicial. *Véase Fernández Mariño v. San Juan Cement*, 118 DPR 113 (1987).

Una vez determinada la existencia de temeridad, la imposición del pago de honorarios de abogado es mandatoria. *Colón Santos v. Coop. Seg. Múlt. P.R.,* supra a la pág. 188; *Blás Toledo v. Hosp. La Guadalupe*, 146 DPR 267, 334 (1998). En consecuencia, la determinación de temeridad conlleva posteriormente la fijación de una suma razonable de honorarios. *Vega v. Luna Torres*, 126 DPR 370 374 (1990). De manera que, la imposición de honorarios de abogado y su cuantía es una

determinación discrecional del tribunal sentenciador, sólo revisable ante indicios de abuso de discreción por parte del juzgador. *Colón Santos v. Coop. Seg. Múlt. P.R., supra*, pág. 188. El monto de los honorarios los determina el tribunal a su discreción al tomar en cuenta el grado de temeridad, el trabajo realizado, la duración y naturaleza del litigio, la cuantía involucrada y el nivel profesional de los abogados. *Velázquez Ortíz v. UPR*, 128 DPR 234 (1991)

Como la imposición de honorarios de abogado descansa en la sana discreción judicial, puede ser variada en apelación si se demuestra abuso de esta. *SLG González-Figueroa v. SLG et al., supra*, pág. 150.

-III-

En su **primer señalamiento de error** sostiene la apelante que incidió el foro primario al no establecer en la Sentencia responsabilidad atribuible al Consejo de Titulares y nivelar la misma con la impuesta a ella.

El hecho que crea la responsabilidad es que el agua cae de una propiedad a la otra. En este caso, la prueba estableció que el agua que entraba al apartamento 708 caía del apartamento 710, perteneciente a la apelante, durante el término de la causa de acción. De ahí emana y se configura la responsabilidad de la señora Mora Piñero, al amparo del Artículo 1541 del Código Civil de 2020, 31 L.P.R.A. § 10806; Artículo 1810 del Código Civil de 1930, 31 L.P.R.A. § 5149

Añade la apelante que en el presente caso no desfiló prueba que sustentara que el origen de la filtración provenía de su apartamento, por lo que el foro primario estaba imposibilitado de adjudicarle responsabilidad únicamente a ella. La señora Mora Piñero sostiene que

el TPI incidió al concluir que el origen del agua que cae carece de relevancia. Arguye que "dicha determinación es esencial para establecer el origen de la filtración y si es un elemento común o uno privativo". Apelación, p. 11

Sin embargo, el foro primario concluyó que el agua *cae* al Apto. 708 desde el Apto. 710, y que la travesía del agua previo a ese momento en que cruza del Apto. 710 al Apto. 708 realmente es inconsecuente para efectos de establecer la responsabilidad absoluta de la dueña del Apto. 710, según el Artículo 1541 del Código Civil de 2020, 31 L.P.R.A. § 10806; Artículo 1810 del Código Civil de 1930, 31 L.P.R.A. § 5149.

Surge de la prueba oral desfilada, que al solicitarle a la señora Mora Piñero que explicara las razones por la cual no arregló el problema durante cinco años a pesar de las conclusiones de todos los profesionales contratados y la insistencia del señor Torres Figueroa y la Junta del Condominio, ella contestó que la terraza es área comunal del Consejo, no un área privativa de ella, y que, por lo tanto, no le correspondía arreglarlo.[19]

De este modo, la señora Mora Piñero ha alegado que la filtración proviene de la terraza comunal de su apartamento y que por lo tanto, ella no es responsable por los daños al Apto. 708. Igualmente, enfatiza que hizo esfuerzos para que el Consejo arreglara la filtración de la terraza a su apartamento.

En cuanto a la naturaleza de la terraza localizada en la azotea del edificio, surge de la Escritura Matriz

---

[19] *Véase Transcripción del Juicio*, páginas. 331-400.

que esta es un elemento común limitado al uso exclusivo del apartamento de la apelante. Conforme al Artículo 43 de la Ley de Condominios, Ley 129 – 2020, 31 L.P.R.A §1922, el adecuado y más eficaz funcionamiento y *mantenimiento de los* equipos o *elementos comunes limitados le corresponde a los titulares de los apartamentos a los que fueron destinados los mismos*". En lo pertinente, el Tribunal Supremo determinó que "*aunque en la escritura matriz de un condominio se denomine un área como elemento común limitado, si responde al servicio de un solo apartamento realmente es un área privativa.*" *Batista Nobbe v. JTA Directores*, 185 DPR 206,223 (2012).

En el caso que nos ocupa la terraza del apartamento 710 es de uso exclusivo de su dueña, en este caso, la apelante. A base de la Ley de Condominios, la jurisprudencia interpretativa y la propia Escritura Matriz del Condominio, le correspondía a su titular hacer las reparaciones en ese espacio.

En el presente caso, la señora Mora Piñero no logró establecer que el condominio era responsable por el empozamiento en su azotea que, a su vez, ocasionó las filtraciones hacia su apartamento y el apartamento 708".[20] Tanto la Ley de Condominios como el Artículo 1810 del Código Civil de 1930 (vigente a la fecha del surgimiento de la causa de acción), le imponían a la señora Mora Piñero responsabilidad absoluta sobre lo que caía desde su apartamento, por lo que el foro primario no incurrió en el primer señalamiento de error de la apelante.

---

[20] *Véase* página 14 de la Sentencia apelada.

Como **segundo señalamiento de error** sostiene la Apelante que erró el foro primario al resolver que los apelados establecieron, mediante preponderancia de prueba, el nexo causal exigido por el Artículo 1810 entre los alegados daños y que estos fueron producto de filtraciones provenientes del Apartamento de la apelante sin contar con evidencia directa que lo sostuviera.

Es preciso destacar que el Consejo comisionó dos estudios de los plomeros Adrián Espinosa y José López, en el 2018 y en el 2021 y que sus informes fueron admitidos en evidencia, el primero por testimonio y el segundo por estipulación.[21]

Sobre esos extremos, el 10 de enero de 2022, la administración del Condominio Villas del Faro le envió una carta a la señora Mora Piñero informándole de los resultados de la inspección del maestro plomero y explicándole que debía responsabilizarse por el arreglo de acuerdo con la Ley 129-2020 (Ley de Condominios de Puerto Rico), Artículo 39(b)(4). *Véase* el *Exhibit 2.*

Además, dos de los peritos, el arquitecto López Bigio y el ingeniero Román, así como la presidenta del Consejo, de manera separada, tomaron fotos del apartamento 710 de la señora Mora Piñero, entre el 2018 y el 2021 que demostraron la falta de mantenimiento y el abandono de la propiedad, la cual tenía humedad y gotitas de agua en el interior. El Arq. López Bigio estimó los arreglos al Apto. 710 en $6,708 en el 2018. *Véase* el *Exhibit* 20.

Los peritos recomendaron sacar las losas de la terraza, sellar la azotea y volver a colocar las losas,

---

[21] *Véase* el *Exhibit* 13 y 22. *Véase además*, Testimonio del plomero Adrián Espinosa a las páginas 122-145 de la *Transcripción del Juicio*

arreglar las parrillas de los desagües y limpiar la azotea para evitar que el material vegetativo tape los desagües. Recomendaron, además, levantar los inodoros y verificar las bañeras. Sugirieron arreglar las partes del empañetado que se habían desprendido de la pared y el descuadre de la puerta que mira hacia el balcón.[22]

De otra parte, es preciso destacar que el testimonio de los apelados, al cual el foro primario adjudicó credibilidad, estableció igualmente que fue el agua que bajaba del Apto. 710 a través del techo y las paredes del Apto. 708, la que causó pérdida del uso y disfrute de la propiedad y el daño al apartamento en la sala, el comedor, y los dos cuartos, en sus paredes y techos. Dichas condiciones hicieron que el Apto. 708 estuviese inhabitable, insalubre e impropio para ser ocupado.

Surge además, de la prueba desfilada que la señora Mora Piñero no arregló su apartamento para detener las filtraciones sino hasta diciembre de 2022. El término de la causa de acción en este caso cubre desde septiembre de 2017 hasta diciembre de 2022. Por su parte, **los apelados establecieron el nexo causal entre la caída del agua y sus daños durante dicho término.**

Con estos antecedentes, en atención al **segundo señalamiento de error**, concluimos que no incidió el foro primario al resolver que los apelados establecieron mediante preponderancia de prueba el nexo causal entre los daños sufridos por los apelados y las filtraciones provenientes del Apartamento de la apelante, las cuales fueron corregidas en diciembre del año 2022.

---

[22] *Véase* la *Transcripción del Juicio,* páginas 122-148 y 290-322 y los *Exbibits* 13 y 20-22.

En el caso de autos, es la contención de la señora Mora Piñero en su **tercer señalamiento de error** que la prueba desfilada en el juicio demostró que los apelados no mitigaron daños.

La doctrina de mitigación de daños postula el deber que tiene una persona que sufre perjuicio de adoptar aquellas medidas razonables pertinentes y a su alcance, tendentes a reducir el monto de los daños. *Véase Fresh-O-Baking Co. v. Molinos de Puerto Rico*, 103 D.P.R. 509, 520 (1975). En el presente caso surge del testimonio de los apelados que estos alertaron tanto a la administración del Condominio como a la apelante sobre las filtraciones, destaparon los desagües, permitieron el acceso a su apartamento para que vinieran a inspeccionar, colocaron cubos, movieron muebles, movieron equipo y cubrieron la mueblería con plástico. Igualmente, estos reclamaron a la señora Mora Piñero en varias ocasiones para que solucionara el problema. Es preciso destacar que la apelante no presentó prueba en contrario.

Concluimos que, a pesar de las medidas razonables que adoptaron los apelados para disminuir o evitar los daños a su propiedad, estos no podían entrar al apartamento de la apelante para arreglar las filtraciones. Es por ello que cualquier reparación que se hiciera en el apartamento de los apelados se deterioraría nuevamente y hubiese culminado en un aumento en la cuantía de sus daños. En el caso de marras el foro primario tampoco incurrió en el tercer error señalado por la apelante.

En lo pertinente a la **valoración de los daños**, es la contención de la apelante en su **cuarto señalamiento**

**de error** que la Sentencia apelada es contraria a la prueba desfilada en el juicio y que el foro primario omitió realizar la valoración de los daños concedidos en la *Sentencia*, conforme a la jurisprudencia análoga a los hechos del presente caso. **La señora Mora Piñero arguye que sólo los peritos pueden ofrecer prueba de daños.**

Como cuestión de umbral, la doctrina vigente establece que los tribunales no requieren prueba pericial para computar los daños compensables, sino prueba con la cual la corte pueda imputarle un valor económico al daño. *Véase Continental Ins. Co. v. Isleta Marina*, 106 DPR 809 (1978). El total de daños probados en el presente caso es de $126,752.76 y ese total incluye partidas ofrecidas mediante el testimonio y las cotizaciones de un contratista y un electricista, así como también del testimonio del señor Torres Figueroa y su esposa, la señora Manzano Vilá.

Los apelados presentaron, además, evidencia de la cotización suscrita el 8 de diciembre de 2023 por el electricista Quintana, quien estimó los daños eléctricos en $16,400.00 y proveyó su testimonio sobre dicha partida. A su vez, el contratista Figueroa testificó que llevó a cabo una inspección del apartamento 208 en marzo de 2023, y basado en sus observaciones, efectuó una cotización de una suma total de $16,994.00, para arreglos de limpieza, pintura, sellado, pulido de piso, remoción de muebles, instalación de abanico y luces, entre otros, en el apartamento 708.

Reiteramos que la prueba del daño no requiere un formato exacto ni particular. Toda vez que los estimados generados por los contratistas, unidos al testimonio de la señora Manzano Vilá fueron creíbles, concluimos que

dicha prueba constituyó base suficiente para justificar la concesión de un remedio en daños a la propiedad.

Indistintamente de lo anterior, surge de los testimonios de los apelados que las filtraciones en su apartamento afectaron el uso y disfrute de su propiedad, desde septiembre de 2017 a diciembre de 2022, fecha en que cesaron las filtraciones, y que estos continuaron pagando la hipoteca, la cual consistía en un pago mensual de $1,200.00 así las cuotas de mantenimiento del apartamento 708, las cuales consistían en un pago mensual de $120.00

Ahora bien, el foro primario valoró el daño pecuniario por la pérdida de uso y disfrute entre septiembre de 2017 hasta diciembre de 2022, como el equivalente a un pago de renta o de hipoteca. Razona el TPI que ese pago se hizo, para obtener el uso y disfrute de la propiedad y que el pago de cuotas de mantenimiento era también uno necesario para la convivencia en un Condominio.

Si bien la prueba desfilada y creída por el foro primario demostró que las filtraciones que emanaban del apartamento 710, limitaron a los apelados el uso de la propiedad, estos tenían que continuar pagando la hipoteca por ser una obligación sobre un inmueble, contraída previamente.

Sin embargo, diferimos del foro primario en cuanto a que la fórmula que procede para valorar el daño pecuniario por la pérdida de uso y disfrute del inmueble entre septiembre de 2017 hasta diciembre de 2022, sea el equivalente al pago de la hipoteca por dicho término.

Vale destacar que el señor Torres Figueroa declaró que realizó el cómputo de la pérdida del uso y disfrute

de la propiedad basado en el pago de la hipoteca y de la cuota de mantenimiento y que eso lo llevó a los años que él entendía que perdió por el uso del apartamento. [23]

Examinado el planteamiento de la apelante en su cuarto señalamiento de error consideramos que incidió el TPI al determinar como una valoración justa de la pérdida del uso y disfrute de la propiedad el monto por el pago de la hipoteca durante el término comprendido entre septiembre de 2017 hasta diciembre de 2022. Primeramente, si bien los apelados vieron limitado el uso y disfrute de su propiedad de alguna forma durante dicho término y la cantidad de pago de hipoteca y de cuota de mantenimiento surge del testimonio de la señora Manzano Vilá y del señor Torres Figueroa, hay ausencia de prueba documental sobre esos extremos que acredite dicho pago. [24] Surge además, de la totalidad de la prueba que el referido inmueble no era la residencia principal de los apelados por lo que la suma determinada por el foro primario por privación de uso y disfrute de la propiedad no es una suma razonable.

Con estos antecedentes, es improcedente valorar el daño pecuniario por la pérdida de uso y disfrute de la propiedad automáticamente como la equivalente al monto de la hipoteca, como si se tratara de la privación del uso y disfrute de la vivienda o residencia principal de los apelados. Téngase en cuenta que el criterio que debe guiar a un juez a la hora de fijar el resarcimiento

---

[23] *Véase Transcripción del Juicio* Pág. 173 L. 19-25; Pág. 174 1-14
   *P Okey. Así que, la pérdida de uso y disfrute, ¿cómo usted la valoró?*
   *R. … Para hacerlo más transparente, pues, utilicé el pago de la hipoteca. Utilicé el*
   *pago de la hipoteca con obviamente, el pago de mantenimiento y lo llevé a los años que yo entendía que perdí el uso del apartamento.*
[24] *Véase Transcripción del Juicio*, páginas 24:24 - 25:6; 173:19-25; 174:1-14.

debido es la razonabilidad. *Meléndez Vega v. El Vocero De PR,* 189 DPR 123, 210 (2013)

Los testimonios ofrecidos por los apelados durante el juicio no estuvieron dirigidos a acreditar una pérdida económica concreta, sino que se limitaron a expresar de manera general su alegada privación de disfrutar una segunda propiedad. Ante ello, el TPI estaba obligado a evaluar y cuantificar, de forma rigurosa, la supuesta pérdida de uso y disfrute reclamada exclusivamente a partir de sus dichos testimonios, máxime cuando los apelados no presentaron evidencia documental alguna de corroboración.

Establecido lo anterior, concluimos que el juicio se celebró y las partes tuvieron la oportunidad de presentar toda la prueba por privación del uso y disfrute de la propiedad. Sin embargo, al adjudicar una compensación basada en sumas globales sin evidencia alguna que la sustentara incidió el foro primario al utilizar como metodología para valorar los daños de los apelados por la pérdida de uso y disfrute de la propiedad la totalidad del monto mensual por el alegado pago de la hipoteca y cuotas de mantenimiento desde septiembre de 2017 a diciembre de 2022, fecha en que cesaron las filtraciones.

En su **quinto señalamiento de error** sostiene la apelante que incidió el foro primario al descartar el informe y pruebas realizadas por el Ing. Emilio Solís y negarle su valor probatorio para determinar el origen de las filtraciones

Es preciso destacar que luego de que se presentara la Demanda el 16 de noviembre de 2022 y la señora Mora Piñero arreglara su apartamento inmediatamente después

en diciembre de ese año, era imposible probar la causa de las filtraciones mediante peritaje. Por eso es que el informe del Ing. Solís carece de valor probatorio para esos fines, ya que este examinó los apartamentos cuando ya no iba a encontrar las filtraciones reclamadas por los apelados.

Surge además del testimonio de los apelados que, para diciembre 2022, previo a las visitas del Ing. Solís, ya las filtraciones habían cesado. Sobre estos extremos, es relevante además, que la señora Mora Piñero ya había admitido en su Contestación a la Demanda que ella "había realizado las correcciones pertinentes" para arreglar los problemas de filtración que "también afectan al apartamento 710".[25] Ello es congruente con el testimonio de los apelados en cuanto a que, para diciembre del año 2022, fecha en que la apelante realizó los trabajos, y previo a las visitas del Ing. Solís, ya las filtraciones habían cesado.

Los experimentos, el informe y el testimonio del Ing. Solís no explican las filtraciones continuas que impidieron el libre uso y disfrute de la propiedad durante el término de la causa de acción, desde el 2017 hasta el año 2022. El Informe del Ing. Solís tampoco atiende la a causa de las filtraciones habidas durante el término de la causa de acción. De otra parte, su experimento, luego de realizadas las reparaciones, propone unas circunstancias extraordinarias que no se probó que hubiesen ocurrido por lo que con dicha prueba tampoco podía imputársele responsabilidad alguna al Consejo. Con estos antecedentes, concluimos que no

---

[25] *Véase* Entrada Núm. 11 de SUMAC TPI.

incidió el foro primario al negarle valor probatorio al testimonio e informe del Ing. Emilio Solís para determinar el origen de las filtraciones.

Finalmente, arguye la apelante en su **sexto señalamiento de error** que incidió el TPI al imponerle temeridad a pesar de los esfuerzos realizados por esta para lograr un acuerdo transaccional.

Sin embargo, cabe señalar, que surge tanto del tracto procesal del presente caso, como de la prueba desfilada, que desde el año 2017 hasta diciembre del año 2022 la inacción de la señora Mora Piñero para corregir la caída de agua de su apartamento hacia el apartamento de los apelados, los llevó a incurrir en esfuerzos extrajudiciales y en un litigio que se pudo evitar. Del expediente se desprende igualmente que fue luego de presentada la Demanda, que la apelante coordinó las reparaciones en su apartamento y acto seguido, una vez realizó las correcciones, comisionó un informe pericial a los fines de certificar que había ausencia de filtraciones en su apartamento y de crear la apariencia de ausencia de responsabilidad por los daños causados al inmueble de los apelados.

Ciertamente, la actitud de la apelante de negarse a realizar las reparaciones durante tanto tiempo obligó a los apelados a asumir las molestias, gastos y trabajo de un litigio innecesario que pudo evitarse, por lo que no incidió el foro primario al hacer una determinación de temeridad e imponer una suma de honorarios por dicho concepto.

**-IV-**

Por los fundamentos anteriormente expuestos, los cuales hacemos formar parte de esta Sentencia,

*modificamos* la Sentencia apelada a los únicos fines de revocar la determinación del foro primario sobre la valorización de daños uso y disfrute de la propiedad, por falta de prueba.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

La juez Aldebol Mora concurre sin opinión escrita.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones